AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: __JG 3/4/24__

# UNITED STATES DISTRICT COURT
### for the
Western District of Oklahoma

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

629 Cedar Ave. Apt. A, Yukon, OK 73099

)
)
)
)
)
)

Case No. MJ-24- 200-SM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

located in the _____Western_____ District of _____Oklahoma_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a)(2) | Distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct |
| 18 U.S.C. § 2252(a)(4)(B) | Possession of and/or access with intent to view a visual depiction of a minor engaged in sexually explicit conduct |
| 18 U.S.C. § 2252A(a)(2)(A) | Distribution and/or receipt of child pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of and/or access with intent to view child pornography |

The application is based on these facts:
See attached Affidavit of Special Agent Andrea Salazar

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrea Salazar, Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/6/24

_____
*Judge's signature*

City and state: Oklahoma City, Oklahoma

Suzanne Mitchell, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Andrea Salazar, being first duly sworn, state as follows:

### INTRODUCTION

1.      I am currently employed as a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so since July 2022. Prior, I was a federal police officer with Pentagon Force Protection Agency and had been so employed since August 2019. I hold a Bachelor's Degree in Criminology and a Master of Public Administration from St. Mary's University. I also hold a Master of Science in Criminal Justice from Sam Houston State University. I am currently assigned to HSI Office of the Resident Agent in Charge Oklahoma City, Oklahoma. As part of my various duties and responsibilities, I investigate federal criminal cybercrime violations. As it relates to cybercrime, I have gained experience conducting child exploitation and child pornography investigations.  My working experience has been augmented by training I received at the Federal Law Enforcement Training Center. Moreover, I have access to the institutional knowledge developed around this type of investigation by working with other experienced child exploitation criminal investigators.  I have become aware of numerous examples of child pornography. Additionally, I have had the opportunity to observe and review hundreds of images and videos of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. § 2252 and 2252A, and I am authorized by law to request a search warrant.

## PURPOSE OF AFFIDAVIT

2.      I have probable cause to believe that contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of 18 U.S.C. § 2252(a)(2) (distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct (and attempt)); 18 U.S.C. § 2252(a)(4)(B) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct (and attempt)); 18 U.S.C. § 2252A(a)(2)(A) (distribution and/or receipt of child pornography (and attempt)); and 18 U.S.C. § 2252A(a)(5)(B) (possession of and access with intent to view child pornography (and attempt)) are presently located within 629 Cedar Ave. Apt. A, Yukon, OK 73099 (the "SUBJECT PREMISES"). I submit this Application and Affidavit in support of a search warrant authorizing a search of the SUBJECT PREMISES, as further described in Attachments A and B, incorporated herein by reference, which is in the Western District of Oklahoma. Located within the SUBJECT PREMISES to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations. I request authority to search the entire SUBJECT PREMISES, including the residential dwelling and premises structures, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as contraband and instrumentalities, fruits, and evidence of crime.

3.      The facts set forth in this Affidavit are based upon my personal observations and training, prior investigations and, where noted, information related to me by other law enforcement officers. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each or every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## DEFINITIONS

4.    The following definitions apply to this Affidavit and Attachment B:

a) "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b) "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

c) "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d) "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications

3

facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

e) "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f) "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code

4

may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g) "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h) "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

i) "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

j) "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

k) "Records," "documents," and "materials," include all information recorded in any form, visual or aural, and by any means, whether in handmade form

5

(including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

l) "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

m) "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## <u>BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, THE INTERNET, AND EMAIL</u>

5.      I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

      a)  Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. Computers basically serve four (4) functions in connection with child pornography: production, communication, distribution, and storage.

      b)  Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera or smartphone to the computer. In the last ten (10) years, the resolution of pictures taken by digital cameras and smartphones has increased dramatically, meaning that such pictures have become sharper and crisper. Photographs taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards often store up to 32 gigabytes of data or more, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

7

c) A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (*i.e.*, "instant messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

d) The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte or larger external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo or a video with a digital camera

8

or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e)  The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f)  Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

g)  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally

9

such as the traces of the path of an electronic communication may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

6.      Based upon my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a) Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult

10

with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched;

b) Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c) The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d) Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal

11

data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

7.     Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

a) The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether

stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

b) In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). Further, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

8. Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.

13

Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

9.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am seeking would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including, but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

## BACKGROUND OF CHAT APPLICATION A[1]

10.     This investigation involves a secure chat platform, herein referred to as Chat Application A. Chat Application A is a communications platform based outside the United States with offices located in various countries including the United States. Service is offered through a desktop-based application along with mobile applications available for Android and iOS operating systems.

11.     Chat Application A is a secure messaging platform that allows its users to place audio and video calls, and send text messages, photographs, and videos. Chat Application A allows

---

[1] Law enforcement knows the actual name of Chat Application A; however, the investigation into users of Chat Application A remains ongoing, and public disclosure of Chat Application A's actual name would potentially alert its members to the investigation, likely provoking members to notify other members of the investigation, to flee, and/or destroy evidence. Accordingly, to preserve the confidentiality and integrity of the ongoing investigation, the actual name and other identifying details of Chat Application A remain undisclosed in this affidavit.

users to have personal one-on-one chats or to have larger group-chats with other Chat Application A users. All chats are protected by end-to-end encryption, meaning only the sender and receiver(s) of a chat have access to the content, and nothing is stored on any servers once delivered. Prior to delivery, or if the recipient's phone is off, the content is encrypted and stored on Chat Application A's servers. If the sender of a message deletes his/her own message, he/she will have an option to delete the message from everyone's device, meaning the original picture, video, or text will no longer appear on all the recipients' devices.

12.     Unlike some other end-to-end encrypted chat platforms, Chat Application A can display the user's verified cellular phone number. To create and subsequently log into Chat Application A, a user must provide a cellular phone number prior to creating an account. The account cellular phone number is sent a verification text message with a verification key code in order to activate the account. Communication on Chat Application A is end-to-end encrypted and stored locally on the device used, meaning only the user can decrypt content stored on the device accessing Chat Application A.

13.     Based on my training and experience, and the training and experience of others I have spoken with, I know Chat Application A is often used for illegal activity, including the exchange and access of child pornography, because of the high degree of anonymity that is offered to users during the use Chat Application A. The encrypted group[s] under the purview of this investigation are not available to the general public. Access to these groups are through invitation only, often through other Chat Application A child pornography sharing groups. For this reason, searching for these groups by group name with a Chat Application A account will not yield any results.

15

## PROBABLE CAUSE

14.    On or about February 22, 2022, HSI Pretoria assisted the South African Police Service (SAPS) during the arrest of a South African national for the possession and distribution of child sexual abuse material (CSAM). During the service of the warrant, the subject of the investigation consented to allow HSI to assume his online identity (hereinafter "Subject Account 2") to a secure, end-to-end encrypted chat platform, Chat Application A. It was determined that the Subject Account 2 had access to 27 large-scale group chats involving numerous individuals trading in Child Pornography as defined by 18 U.S.C. § 2256.

15.    HSI Pretoria accessed the Chat Application A Account, Subject Account 2, and took screen recordings of all group chats from the date the South African national joined these groups. Additionally, a separate screen recording for each group was recorded, documenting each member of the group's username and verified cellular phone number. All videos and images shared within each respective group were downloaded and saved for evidentiary purpose.

16.    The various groups under investigation within the HSI Pretoria Case are not available to the general public. Access to these groups is by invitation only, often through other Chat Application A groups.  For this reason, searching for these groups within Chat Application A will not yield any results. Once invited to these groups under investigation, a Chat Application A user needs to accept the invitation and can choose whether or not to join the group. After joining the group, a user can leave the group at any time. Any user who had previously left any of the groups under investigation by HSI Pretoria without posting CSAM content, would not fall under the purview of this investigation.

16

17.    One of the groups intercepted within Subject Account 2 was named "Mario bros" without an admin. The group was created on or joined by Subject Account 2 on March 20, 2021. The contents of the group were captured and preserved by HSI Pretoria on or about April 5, 2022. At the time the evidence/contents were captured and preserved, the group had a total of approximately eighty-six (86) users. Throughout this period, numerous files were shared depicting child pornography as defined in 18 U.S.C. § 2256. Below is a summary of some files distributed within the group:

    a) One video posted was approximately 45 seconds in length. The video depicted a prepubescent infant male lying on his back with his clothing unbuttoned, revealing his penis. A female adult is shown performing oral sex on the infant/toddler.

    b) One video was approximately 30 seconds in length. The video depicted a prepubescent female, approximately three (3) to six (6) years of age. The prepubescent female is asleep and there appears to be an adult male's hands spreading the vaginal and anal openings of the prepubescent minor female.

    c) One video was approximately 30 seconds in length. The video depicted a nude prepubescent female, approximately eight-to-twelve years of age, standing with one leg lifted exposing her vaginal area.

18.    I reviewed a recording in which HSI Pretoria scrolled through the messages being sent in the "Mario bros" group. The majority of the messages I observed depicted child sexual abuse material. As noted above, the "Mario bros" group is not accessible to the general public; rather, any user in it must receive an invitation to the group and accept that invitation.

17

19.     One user was a member of the "Mario bros" group and had the username "Hank" and verified cellular phone number of +1 (405) 397-8842. On or about March 22, 2022, HSI Pretoria served AT&T Wireless with a child exploitation summons for cellular phone number: 405-397-8842. On or about March 23, 2022, AT&T Wireless produced subscriber information for the above number which is summarized below:

| | |
|---|---|
| Name | Lynn Stokes ("**STOKES**") |
| Address | 8902 W. Lakeview Pl., Oklahoma City, OK 73127 |
| Activation Date | October 30, 2020 |

20.     On July 5, 2022, HSI Pretoria sent out a collateral request to HSI Oklahoma City, to conduct any investigative activity deemed necessary in furtherance of this investigation. On July 14, 2022, HSI Oklahoma City opened up a case to investigate **STOKES**. On December 12, 2023, I was assigned to investigate **STOKES**.

21.     On December 12, 2023, I served an administrative subpoena to AT&T Mobility for mobile number 405-397-8842. On December 13, 2023, AT&T responded that the number had been deactivated by **STOKES** on October 20, 2022.

22.     An Accurint search for **STOKES** on December 12, 2023, and December 23, 2023, identified the most recent residence associated with **STOKES** as 629 Cedar Ave. Apt. A, Yukon, OK 73099 ("the **SUBJECT PREMISES**") as of September 2019. Accurint also provided a former address of 8902 W. Lakeview Pl., Oklahoma City, OK 73127.

23.     As of December 15, 2023, the Oklahoma Employment Security Commission (OESC) has record of an unemployment claim for **STOKES** with an effective date of April 18,

18

2021. The address for **STOKES** listed on the claim is 629 Cedar Ave. Apt A, Yukon, OK 73099. The phone number listed on the claim is 405-397-8842. The separating employer is listed as Unit Drilling Company, with an address of P.O. Box 280100, Nashville, TN 37228.

24.     On December 15, 2023, at approximately 3:20 P.M., I conducted surveillance at 629 Cedar Ave. Apt. A, Yukon, OK 73099. A white Chevrolet SUV with Oklahoma license plates DFH172 was observed parking in the driveway of the residence. No individual was seen leaving the residence. Upon further investigation, the vehicle came back registered to Virginia Lee Stokes at 8902 W. Lakeview Pl. Oklahoma City, OK 73127.

25.     On December 19, 2023, I reached out to Detective Dave Carroll with Yukon Police Department, to inquire if **STOKES** has had any encounters with Yukon police. Detective Carroll responded with a copy of two Yukon Police Department Case Reports. On September 23, 2020, **STOKES** was a witness to an assault and provided 629 Cedar Ave Apt A, Yukon, OK 73099 as his home address. The second police report by Yukon Police Department was on November 28, 2021, and stated **STOKES** was a victim to an unlawful entry to his residence. **STOKES'** address, according to the police report, was 629 Cedar Ave. Apt. A, Yukon, OK 73099.

26.     On December 26, 2023, I reached out to HSI Task Force Officer Aaron McKey, Oklahoma Highway Patrol, to inquire if **STOKES** has had any encounters with Oklahoma Highway Patrol. Officer McKey responded with a copy of a traffic citation written to **STOKES** on September 5, 2023, for failure to properly wear seatbelt. **STOKES** listed his address as 629 Cedar Ave. Apt. A, Yukon, OK 73099. The vehicle listed on the citation was a 2015 white, SUV Chevrolet with Oklahoma license plates DFH172. The same vehicle was observed parked in the driveway of the residence during surveillance on December 15, 2023.

19

27.    On January 10, 2024, at approximately 1:15 P.M., HSI Special Agent (SA) Itkin and I met with Detective Dave Carroll from Yukon Police Department to discuss conducting a knock and talk at 629 Cedar Ave. Apt. A, Yukon, OK 73099, to confirm **STOKES'** residency. I observed Detective Carroll and a Yukon Police Officer approach 629 Cedar Ave. Apt. A, Yukon, OK 73099. A white male answered the door and stepped outside to speak to the officers. I then observed the encounter end and the officers leave the residence at approximately 1:45 P.M. Body camera footage was made available from the encounter that showed Detective Carroll was able to confirm the individual identified themselves as **STOKES**.

28.    On February 1, 2024, at approximately 9:20 A.M., I conducted surveillance at 629 Cedar Ave. Apt. A, Yukon, OK 73099. I did not observe anyone leave the residence or a vehicle parked on the premises. However, since the January 10 knock and talk, I have not received any information suggesting that **STOKES** has vacated the **SUBJECT PREMISES**.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS AND/OR ATTEMPT TO VIEW CHILD PORNOGRAPHY

29.    Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who possess and/or attempt to view child pornography:

    a)  Such individuals often receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

    b)  Such individuals may collect sexually explicit or suggestive materials in a

variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c) Such individuals may possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children often retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d) Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then

21

delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e) Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[2]

f) Such individuals also may correspond with and/or meet others to share information and materials, rarely completely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, telephone numbers, and usernames of individuals with whom they have been in contact and who share the same interests in child pornography.

g) Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the

---

[2] *See United States v. Wagner,* 951 F.3d 1232, 1246 (10th Cir. 2020) ("Courts are less receptive to staleness challenges when the warrant concerns child pornography because 'persons interested in those materials [are likely to hoard them] in the privacy of their homes . . . for significant periods of time.'" (quoting *United States v. Perrine,* 518 F.3d 1196, 1206 (10th Cir. 2008)). *See also United States v. Carroll,* 750 F.3d 700, 706 (7th Cir. 2014) (concluding that five-year delay was not too long because "a staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *United States v. Seiver,* 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, *e.g., United States v. Allen,* 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson,* 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis,* 605 F.3d 395, 402 (6th Cir. 2010)).

world. Thus, even if **STOKES** or other co-conspirators use a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the **SUBJECT PREMISES**, or on his person as set forth in Attachment A.

## BIOMETRIC ACCESS TO DEVICES

30.     This warrant permits law enforcement to compel **STOKES** to unlock any devices requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a) I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b) If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home"

23

button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c) If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d) If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition

24

features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e) In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f) As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g) I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when:

(1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h) Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of **STOKES** to the fingerprint scanner of the devices found at the **SUBJECT PREMISES** or on the person of **STOKES**; (2) hold the devices found at the **SUBJECT PREMISES** or on the person of **STOKES** in front of the face of **STOKES** and activate the facial recognition feature; and/or (3) hold the devices found at the premises or on the person of **STOKES** in front of the face of **STOKES** and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that **STOKES** state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel **STOKES** to

26

identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

### CONCLUSION

31.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

32.     I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Andrea Salazar
Special Agent
Homeland Security Investigations

Sworn and subscribed before me via telephone this 6ᵗʰ day of March, 2024.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE

27

**ATTACHMENT A**

**DESCRIPTION OF LOCATIONS TO BE SEARCHED**

**629 Cedar Ave. Apt. A, Yukon, OK 73099** (the **"SUBJECT PREMISES"**). The

**SUBJECT PREMISES** is located on Cedar Avenue in Yukon, Oklahoma. The dwelling appears

to be a one-story duplex that shares a wall and roofing with 629 Cedar Ave Apt B. The duplex is

tan in color with white trim. The front door to the premises is white with a silver door knob.

There are two windows on the front of the premises as well as two windows on the side of the

residence. According to the Canadian County tax assessor, the property is approximately 1,536

square feet. Photographs of the **SUBJECTS PREMISES** are below:



28



The premises to be searched includes the entire residential building, all rooms, attics, basements, closed and/or locked containers and safes, and other places therein which are part of the **SUBJECT PREMISES** and the surrounding grounds, including storage areas, utility sheds, garages, mailboxes, trash containers, trailers, and out-buildings whether attached or detached. The search shall also include vehicles under the dominion and control of the occupants of the **SUBJECT PREMISES**.

The search of the **SUBJECT PREMISES** also includes the search of any persons found or arriving on the **SUBJECT PREMISES** during the course of the search to search for the items

29

described in Attachment B.  These persons include, but are not limited to, **LYNN STOKES**, whose date of birth is 3/XX/1978, and whose photo is depicted below:



It should be noted that the **SUBJECT PREMISES** may be a multiunit premises. If a multiunit premises is identified at the time of entry, the search will be limited to solely the piece of the property that **STOKES** resides in and/or has access to and the person of **STOKES**.

30

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials reasonably believed to be used by, made by, possessed by, or associated with **LYNN STOKES,** which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § 2252(a)(2) (distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct (and attempt)); 18 U.S.C. § 2252(a)(4)(B) (possession of and/or access with intent to view a visual depiction of a minor engaged in sexually explicit conduct (and attempt)); 18 U.S.C. § 2252A(a)(2)(A) (distribution and/or receipt of child pornography (and attempt)); and 18 U.S.C. § 2252A(a)(5)(B) (possession of and/or access with intent to view child pornography (and attempt)):

1.      Computers or storage media used as a means to commit the violations described above.

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

        a)  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

31

b) evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c) evidence of the lack of such malicious software;

d) evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e) evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f) evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g) evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h) evidence of the times the COMPUTER was used;

i) passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j) documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k) records of or information about Internet Protocol addresses used by the COMPUTER;

32

    l) records of or information about the COMPUTER's Internet activity, specifically: firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

    m) contextual information necessary to understand the evidence described in this attachment.

3.    Routers, modems, and network equipment used to connect computers to the Internet.

4.    Child pornography and child erotica (including on the computers or storage media as defined herein).

5.    Records, information, and items relating to violations of the statutes described above specifically:

    a) Records, information, and items relating to the occupancy or ownership of the **"SUBJECT PREMISES," 629 Cedar Ave. Apt. A, Yukon, OK 73099,** specifically: utility and telephone bills, mail envelopes, or addressed correspondence.

    b) Records, information, and items relating to the ownership or use of computer equipment found in the above residence, specifically: sales receipts, bills for Internet access, and handwritten notes.

    c) Records and information relating to the identity or location of the persons suspected of violating the statutes described above.

    d) Records and information relating to the sexual exploitation of children.

    e) Records and information relating to Chat Application A and/or Subject Account 2.

    f) Records and information pertaining to username "Hank."

As used above, the terms "records" and "information" includes all forms of creation or storage, specifically: any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies); and any cloud storage (which the aforementioned electronic devices are connected to).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

During the execution of the search of the **SUBJECT PREMISES** and/or **LYNN STOKES** described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of **STOKES** to the fingerprint scanner of the devices found at the **SUBJECT PREMISES** or on the person of **STOKES**; (2) hold the devices found at the

**SUBJECT PREMISES** or on the person of **STOKES** in front of the face of **STOKES** and activate the facial recognition feature; and/or (3) hold the devices found at the **SUBJECT PREMISES** or on the person of **STOKES** in front of the face of **STOKES** and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

The proposed warrant does not authorize law enforcement to compel that **STOKES** state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel **STOKES** to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.